In re Don L. HAMMOND, Debtor.

Berdene D. Dennison, Plaintiff,

v.

Don L. Hammond, Defendant.

Bankruptcy No. 97B–24166.
Adversary No. 97PB–2227.

United States Bankruptcy Court,
D. Utah,
Central Division.

Dec. 17, 1998.

George H. Speciale, Salt Lake City, Utah, for plaintiff.

David J. Hodgson, Salt Lake City, Utah, for defendant.

## MEMORANDUM DECISION

JUDITH A. BOULDEN, Bankruptcy Judge.

This adversary proceeding seeks a determination of whether a debt incurred by the debtor incident to a divorce proceeding is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(5) or 523(a)(15).[1] The Court has carefully weighed the evidence presented during two days of trial, judged the credibility of the witnesses, considered the briefs and arguments of counsel, and has made an independent review of applicable statutes and case law. Based thereon, the Court determines that the debt owed by the debtor to the plaintiff is dischargeable pursuant to 11 U.S.C. § 523(a)(5), but nondischargeable pursuant to 11 U.S.C. § 523(a)(15). The Court's findings of fact and conclusions of law are set forth herein pursuant to Fed.P.Bankr.P. 7052(a).

[1]. The Plaintiff's claim's plead pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6) were dis-missed.

## FACTS

Don L. Hammond, the Debtor herein (Debtor), and Berdene D. Dennison (Dennison) were married on September 3, 1965, and have children born during the marriage. The parties acquired two major assets during their marriage: a seven bedroom marital home with an equity of approximately $20,000, and a contract receivable referred to as the HHEICO Contract. The HHEICO Contract resulted from the sale of an apartment building from which the parties were to be paid $274,993. The sale provided a stream of payments to the parties of $2,577 per month, subject to debt service of $1,800, leaving a positive cash flow of $777 per month. The division of this stream of payments between the parties was pivotal in the divorce negotiations, and its characterization is the basis of the dispute in this proceeding.

In 1989, approximately twenty-four (24) years after their marriage, Dennison filed a complaint for divorce. Although the terms of the divorce were contested and negotiated for over a year, the decree divorcing the parties was the product of settlement negotiations between the parties that occurred on the day the divorce proceeding was scheduled for trial. The parties did not participate directly in the settlement negotiations, but instead reviewed the suggestions and proposals advanced by their attorneys. The Decree of Divorce, which incorporated the parties' stipulation, was entered by the divorce court on May 21, 1991 (Decree).

### 1. *The Decree*

The Decree contains twenty (20) numbered paragraphs that are not separated into categories, and are not delineated by sub-headings such as "Property Settlement" or "Maintenance or Support." The Decree awarded custody of the parties'

two (2) minor children to Dennison, and ordered the Debtor to pay $163.52 per month per child as support, for a total of $327.04 per month. The Decree also ordered that the marital home was to be sold (in part because the parties could not afford to maintain the debt service post-divorce) and the equity divided equally between the parties. Until the marital home was sold, Dennison had the right to reside in the home, and each party was ordered to pay one-half (½) of the total monthly mortgage payments of $987.00, or $493.50. Although the Decree ordered the Debtor to pay one-half (½) of Dennison's attorney fees as well as his own, there was no provision for an award of fees should either of the parties find it necessary to enforce the Decree.

The two paragraphs [2] in the Decree that are at issue in this adversary proceeding are paragraph six (6) in which Dennison waived her right to alimony, and paragraph seven (7) which provided that the $777 per month net payment the Debtor received from the HHEICO Contract would be divided with the Debtor forwarding sixty-five percent (65%) or $505.05 per month to Dennison (the HHEICO Payments), and the Debtor retaining the remaining thirty-five percent (35%) or $271.95.[3] Although the Decree is silent as to the duration of the HHEICO Contract, Dennison understood that the HHEICO Payments would continue for approximately twenty (20) years. There is no language in the Decree that the HHEICO Payments cease upon Dennison's death, remarriage or cohabitation. The Decree does not indicate the origination of the HHEICO Contract, or whether the HHEICO Payments are a property settlement or support award.

A written settlement offer made by the Debtor's attorney to Dennison's attorney prior to the Decree on October 11, 1990 (Settlement Offer) provides some explanation of the bargaining process and, tangentially, the intent of the parties relative to the HHEICO Payments. In the Settlement Offer, the Debtor offered Dennison a total monthly child support payment of $606,[4] an alimony payment of $235 per month, and thirty percent (30%) of the net HHEICO Contract proceeds based on the Debtor's belief that this was Dennison's

---

2. The remaining paragraphs in the Decree can be summarized as follows. The first paragraph of the Decree states that the parties are awarded a divorce on the basis of irreconcilable differences. Paragraphs two (2) through four (4) deal with custody, child support, and other issues relating to the parties' minor children. Paragraphs five (5), eleven (11), and fourteen (14) through sixteen (16) provide for individual liability on marital debt. Paragraph eight (8) deals with the marital residence, including ownership and monthly payments and requires the parties to list the residence for sale. Paragraphs nine (9), ten (10), twelve (12), thirteen (13) and eighteen (18) divide assets between the Debtor and Dennison that appear to have been acquired during the marriage, including retirement accounts, automobiles, federal tax refunds, furniture, and food storage. Paragraphs seventeen (17), nineteen (19), and twenty (20) deal with contempt and attorney fees issues related to the divorce proceeding.

3. The applicable provisions of the Decree provided as follows:

6. [Dennison] waived any right she may have to alimony and therefore no award of alimony is made by this court.
7. [Dennison] is awarded sixty-five percent (65%) of the net proceeds of the HHEICO contract and the [Debtor] is awarded thirty-five percent (35%) of the net proceeds of the HHEICO contract. The current net proceeds from the HHEICO contract are $777.00 per [sic]. [Dennison] is entitled to receive $505.05 per month and the [Debtor] is entitled to receive $271.95 per month from the HHEICO contract. In the event the net amount received from the HHEICO contract shall differ from the $777.00 per month, then the parties shall divide the net proceeds sixty-five percent (65%) to [Dennison] and thirty-five percent (35%) to the [Debtor].
Decree at 4–5, ¶¶ 6–7.

4. The monthly child support payment was calculated utilizing the state court child support worksheet that reflected gross monthly income of $1,232 for Dennison, and $3,413 for the Debtor.

equity interest therein.[5] The alimony payment was to be reduced as soon as the marital home was sold, with the provision that Dennison would be required to reinvest all of her one-half (½) of the proceeds in a smaller residence with a purchase price of not more than $65,000. The Debtor's alimony payment would then be reduced to a sum equal to sixty percent (60%) of the difference between the monthly mortgage payments on the marital home ($987) and the monthly mortgage payments on the replacement home. Depending upon the amount of the one-half (½) equity received by Dennison after the sale of the marital home and the resulting new mortgage payment, the effect could have been to eliminate the alimony payment altogether.[6]

After the date of the Settlement Offer, the Debtor lost his employment because, he testified, of his poor work performance resulting from the stress of the divorce. Apparently as a result of his decrease in income and the parties subsequent negotiations, the Decree differed substantially from the Settlement Offer. Child support for two minor children still living at home was reduced from $606 to $327, alimony

---

5. The Settlement Offer explains further:

> Our proposal of 30% [of the HHEICO Contract] is based upon the history of the property that ultimately turned out to be the property of the partnership.
>
> The parties purchased a duplex in November, 1971, for approximately $32,000.00. The purchase involved a $4,000.00 down payment. $2,000.00 of the $4,000.00 down payment was generated by the sale of the Island Park Property which was acquired by [the Debtor] prior to the marriage. The remaining portion of the down payment was financed by loans which were repaid by marital income. Thus, giving [the Debtor] credit for one-half of the marital contribution, he provided 75% of the initial capital investment which resulted in this purchase.
>
> The duplex was sold in August, 1974. The proceeds of the loan were used to purchase a 4-plex.... The 4-plex was sold in May, 1976. At that time, a partnership was formed wherein [the Debtor], [Dennison], and [others] were listed as partners, [and the partnership] purchased a 16-unit apartment house. The partnership agreement provided that [the Debtor] and [Dennison] each held a 25% interest with respect to the other partners. However, as between themselves, there was still a disproportionate capital contribution to the property.
>
> . . .
>
> After execution of the partnership agreement, [the Debtor] borrowed $5,000.00 from his mother, ... to pay a tax liability on a parcel of property owned by the partnership. [Dennison] has always considered this to be [the Debtor's] separate obligation. A similar contribution of $5,000.00 was made by [the other partners]. This resulted in an adjusted capital contribution of $48,500.00 ($38,000.00 initial contribution plus $10,000.00 additional contribution). The contribution resulted in the following percentages: [the other partners, 50%]; [the Debtor], 30% ($14,625.00 divided by $48,500.00 = 30%); and [Dennison], 20% ($9,625.00 divided by $48,500.00 = 20%).
>
> In December, 1986, [the Debtor] and [Dennison] purchased the [other partners] interest in the partnership for $28,000.00. The purchase price was obtained by [Dennison] selling her IRA for $960.00, [the Debtor] selling his IRA for $2,481.00, a loan from [the Debtor's] mother of $2,000.00 and the balance from marital funds and loans repaid from marital funds. The cash portion ($960.00 plus $2,481.00 plus $2,00.00 equals $5,441.00) was again disproportionate in that [the Debtor] contributed 82% ($4,481.00 divided by $5,441.00 = 82%) and [Dennison] contributed 18% ($960.00 divided by $5,441.00 = 18%).
>
> The 16-unit apartment house was sold in consideration of the existing real estate contract [a.k.a. the HHEICO Contract] which provides a net monthly payment of $777.00 ($2,577.00 − $1,800.00 = $777.00).
>
> . . .
>
> [W]e believe an equitable distribution of the partnership interest should be 70%/30% as noted in the proposed settlement agreement.

Letter from Robert M. McDonald to Claire Zanolli (10/11/90) at pp. 3–4.

6. The mortgage on the marital home was approximately $97,000 resulting in a mortgage payment of $987. As an example, if $10,000 (Dennison's equity in the marital home) was paid as a down payment on the replacement home, and a $55,000 mortgage obtained with a monthly payment of approximately $560, the difference between the two mortgage payments would be approximately $427. Sixty percent (60%) of that figure is $256. Such a scenario would eliminate the proposed $235 alimony payment.

was eliminated, Dennison could do as she wished with her one-half (½) of the equity in the marital home, and instead of the Debtor receiving seventy percent (70%) of the HHEICO Contract income or $543, he was ordered to pay sixty-five percent (65%) or $505 to Dennison and he would receive only thirty-five percent (35%) or $271.

### 2. *The HHEICO Payments*

The Debtor generally made the HHEICO Payments to Dennison from approximately May of 1991 to November or December of 1992. On November 2, 1992, shortly after Dennison remarried in October of 1992, the Debtor assigned the HHEICO Contract to a third party in exchange for a loan of $25,000 he wished to use for a gold mine investment. The assignment granted the Debtor an option to reacquire the HHEICO Contract for $30,000 on or before January 3, 1993. The Debtor failed to exercise the option to recover the HHEICO Contract and, as a result, he lost it. The HHEICO Contract was subsequently sold to the Debtor's brother-in-law. Because the Debtor received no net proceeds from the HHEICO Contract, he stopped making the HHEICO Payments to Dennison.

Sometime in 1993, Dennison sought to enforce the Debtor's obligation under the Decree to make the HHEICO Payments to her. She initiated an order to show cause proceeding in the divorce case seeking a finding that the Debtor willfully and intentionally violated the Decree, because, among other things, he ceased making the HHEICO Payments. The divorce court found the Debtor willfully and intentionally violated the Decree and found him in contempt of court. The issue of whether the HHEICO Payments provided in the Decree were in the nature of support or a property settlement was never raised despite the fact that Dennison was remarried at the time. However, the divorce court noted that Dennison relied on the HHEICO Payments for her support. *Hammond v. Hammond,* No. 894904063 (Third District Court, Salt Lake County, Utah) (Memorandum Decision) (1/14/94) at p. 6. The attorney who represented Dennison in the order to show cause proceeding also testified that Dennison needed the funds.

The divorce court sanctioned the Debtor, and based upon the balance owing on the HHEICO Contract of $262,951.41 at the time it was lost, awarded Dennison $505.05 per month for 218 consecutive months commencing with the entry of a final judgment on the issue. The sanction award was calculated to equal "the amount that [Dennison] would have received under the HHEICO contract had the [Debtor] not lost it." *Id.* at 6. The court also ordered that "in the event the [Debtor] defaults in his monthly payment obligation to [Dennison], [Dennison] shall determine the net present value of the balance remaining to be owed to [Dennison] by discounting the dollar amount by the contract rate (9.75%) and shall be entitled to judgment in that amount." *Id.* The divorce court also ordered the Debtor to serve thirty (30) days in jail, with the sentences suspended as long as he made payments to Dennison. The Debtor did not make subsequent payments to Dennison, appealed the decision to the Utah Court of Appeals, and then filed this case seeking to discharge the HHEICO Debt and attorneys fees related thereto. The present value of the unpaid payments has been calculated according to the terms of the divorce court's Memorandum Decision to be not less than $51,509.37 as of December 13, 1994 and accrues interest at 9.75% or $13.75 per day. The total amount of the HHEICO Payments owed to Dennison as of the date of trial is $70,979.37 (HHEICO Debt).

### 3. *The Intent of the Parties with Respect to Alimony, Maintenance, and Support*

Contrary to the representations of his attorney in the Settlement Offer, the Debtor testified that he was adamant through-

out the course of the divorce proceeding that he would never pay alimony, maintenance, or support to Dennison.[7] The Debtor does not remember having any discussions with his divorce attorneys to the effect that he may be required, as a matter of law, to pay Dennison alimony. Like the Debtor, Dennison recalls that at the time of the Decree, the Debtor made it clear that he would not pay alimony, maintenance or support. The Decree is consistent with the Debtor's declarations and provides no alimony.

Dennison testified that she waived any right she may have had to alimony because she knew she would receive the HHEICO Payments. She testified that she needed the HHEICO Payments for support because her income at the time of the Decree was not adequate if she remained in the marital home. Dennison also testified that her income was also probably insufficient to cover her expenses if she was not residing in the marital home, but she was unsure of the amount of the shortfall.

The Debtor's conduct immediately after the Decree is circumstantial evidence of his intent at the time of the Decree not to pay Dennison alimony, maintenance, or support. Within days of the Decree becoming final, the Debtor informed Dennison that he was unhappy with the Decree, would not give her another dime and if necessary, he would see the marital home foreclosed rather than to pay one-half (½) of the mortgage payment until it was sold as provided in the Decree. Because Dennison counted on the $493 payment from the Debtor to be able to make the mortgage payment on the marital home, she could not make the entire $987 mortgage payment herself.

To avoid foreclosure, Dennison was forced to move out of the marital home and sell her one-half (½) interest to a daughter for $6,000. The Debtor then moved into the basement of the marital home with the parties' twelve year old daughter, and lived there for one and a half (1½) years. During that time, the Debtor paid less than one-half (½) of the mortgage payment. A daughter, who was also living in the marital home, paid the balance. Thereafter the home was sold.

### 4. *The Financial Condition of the Parties*

#### A. *Opportunities for Employment*

The Debtor has a high school education and has been employed in the mechanical engineering field as a mechanical designer, as an independent contractor, employee and sometimes through an employment service. Since 1975, he has operated a part-time business from home doing heating, ventilation, and air conditioning calculations. Despite the fact that the Debtor is not a licensed engineer and has no college degree, he listed his occupation as mechanical engineer employed by Alliant Tech Systems on Schedule I of his Statements and Schedules, filed under penalty of perjury.

The Debtor testified that he has suffered from a general malaise since his divorce seven (7) years ago and finds it difficult to motivate himself at work. No contradictory evidence was presented, although the Court finds the purported duration of the Debtor's affliction to be rather extraordinary, especially given the fact that the Debtor remarried in 1993.

Dennison graduated from high school and attended one year of college. She took computer science classes for two or three months sometime in the mid-seventies. She worked for a short period of time for a credit agency doing clerical work prior to 1989 and has worked for the State of Utah in both part-time and full-

7. Even under the Settlement Offer which proposed a $235 alimony payment, the alimony would likely be significantly reduced or eliminated entirely upon the sale of the marital home and the forced reinvestment of Dennison's equity interest in the replacement home. *See supra* note 6 and accompanying text.

time positions as an accounting technician since 1989.

## B. *Income, Expenses and Assets*

Evidence was received regarding the parties income and expenses at three points in time: one year prior to the entry of the Decree, at the time of the entry of the Decree, and at the time of the trial in this matter.[8] The evidence of income and expenses at these points in time was often incomplete and contradictory. In May of 1990, approximately one year before the Decree was entered, both Dennison and the Debtor filed financial declarations in their divorce case itemizing their income and expenses. The financial declarations provide at least some help in clarifying the parties' income and expenses at or about the time of the Decree. The Debtor's testimony regarding his income at the time the Decree was entered is especially contradictory, with a substantial deviation that could possibly be attributable to the passage of time. Furthermore, his testimony regarding discrepancies between his expenses listed on his Schedule J filed in this bankruptcy case and his actual expenses at the time of filing are less easily explained, and lead the Court to conclude that his testimony regarding his actual expenses lacks credibility and is probably inflated.

### 1. INCOME AND EXPENSES AT THE TIME OF THE DECREE

In spite of the inconsistencies in the evidence, the Court has carefully considered all of the evidence presented to arrive at a determination of the parties' income and expenses at the time of the Decree. These determinations are made excluding the impact of the HHEICO Contract stream of income and expenses, but including the child support and division of payments on the indebtedness on the marital home as provided in the Decree. The Debtor's income at the time of the decree when he had just become reemployed was $15.00 per hour. This hourly wage and the testimony presents a possibility of gross income, based upon the evidence, ranging between $1,200 and $2,600 per month. There is no evidence regarding how many hours per week the Debtor worked, inconsistent evidence regarding any deductions from his gross income and whether he paid taxes on his income, or for how long he was employed in 1991 at that pay rate. Based upon the best evidence available, the Court determines that the Debtor's probable gross monthly income from wages at the time of the Decree was $2,600 based upon a 40 hour work week. His expenses at the time of the Decree, including his child support payment and one-half (½) of the debt service on the marital home, were $2,488. The Debtor thus had surplus income, exclusive of the HHEICO Contract of $112 per month.

Dennison's net income from wages was $1,118 per month, and she also received $327 from the Debtor in child support and $493 from the Debtor for the mortgage payment for a total income of $1,938. Her expenses at the time of Decree were $2,498, which included the entire mortgage payment on the marital home of $987. Dennison thus had a negative cash flow of $560 per month, and without an additional source of income would be unable to make her one-half (½) payment on the marital home until it was sold, and pay the remainder of her expenses.

The addition of the net proceeds of the HHEICO Contract as divided by the Decree to the parties' surplus income has the following impact. The Debtor's surplus income increased to a positive $383. Dennison continued to have a negative cash flow of $54.

### 2. INCOME AND EXPENSES AT THE TIME OF THE TRIAL

When the parties tried this adversary

8. The Debtor's Statement of Affairs and Schedules dated in May of 1997 were also received into evidence.

proceeding, both had remarried spouses[9] with children from prior marriages, and neither the Debtor nor Dennison resided in the marital home. The Debtor testified that his income and expenses at the time of trial were the same as when he filed his chapter 7 petition on May 13, 1997, with the exception that a daughter, previously on a religious mission, had returned to live with he and his current wife. He also testified that although two daughters currently resided with him, one would soon be moving out. The Debtor's Schedule I indicates the Debtor is employed as a mechanical engineer at a gross monthly salary of $4,100,[10] with deductions, not including retirement savings, of $1,010, leaving a net income prior to expenses of $3,090. The Debtor's household income is supplemented by his current wife's income of $1,000, not including her deductions for retirement savings, plus $250 received in child support from her former spouse on a fairly consistent basis. The Court concludes that the Debtor's net household income, prior to deductions for living expenses and retirement savings at the time of trial is $4,340.

The Debtor's Schedule J in this case shows $2,771 in monthly expenses. He testified those figures were wrong. His new version of his expenses at the time of filing indicates $3,851 in monthly expenses. Since filing, the Debtor testified that his expenses have changed in that he has now reaffirmed certain debt, one child is no longer living in his household, and his expense for the child on a religious mission has been eliminated upon the child's return. The Court finds that the Debtor's household expenses at the time of trial total $3,153.50, exclusive of charitable and retirement contributions. Therefore, the Debtor has available surplus income for his family of $1,186 each month. From

that figure, $390 is currently being paid into the Debtor's voluntary retirement savings, $180 into the Debtor's wife's voluntary retirement savings, and the Debtor pays approximately $400 per month in charitable contributions. During the past several years, the Debtor and his wife made total charitable contributions as follows: 1993, $3,400; 1994, $4,300; 1995, $5,000; 1996, $5,000; and 1997, $9,000.

At the time of trial, Dennison was working full time for the State of Utah as an account technician. Her gross monthly income was approximately $1,800. Her husband works full time and makes approximately $18.00 an hour, or a gross monthly income of $3,120. He has diabetes and is uninsurable. Dennison withholds approximately $562 per month from her paycheck to be paid into her 401(k) retirement savings. Her husband has some money deducted from his paycheck for a 401(k) retirement account, but the amount was not put into evidence. Little testimony or other evidence was offered regarding Dennison's or her husband's monthly paycheck deductions or monthly household expenses at the time of trial. No children reside in their home. The Court cannot determine what Dennison's monthly net household income, expenses, or surplus income was at the time of trial.

### 3. ASSETS AND LIABILITIES AT THE TIME OF TRIAL

At the time of filing, the Debtor's assets included, among other things, life insurance policies, a 1995 Ford Winstar Van (with encumbrances of $8,000 to $10,000), and a retirement account, totaling $17,147. The Debtor's Schedule D, E, and F list five unsecured creditors with liquidated claims totaling $25,000, in addition to R.C. Willey, liability on the Winstar Van, and an unknown amount to the Internal Revenue

---

9. The Debtor remarried on April 9, 1993.

10. The Debtor testified that his current employment was temporary and he did not expect his job to last much longer than April or May of 1999. He also testified that he did not believe he could find employment that would

pay him what he was currently making. However, the Court finds that the Debtor's statements regarding his inability to find other employment at his current rate of pay were self-serving and lacked factual support.

Service.[11] Only two unsecured creditors totaling $2,300 are unrelated to this adversary proceeding. The Debtor has incurred approximately $6,700 in attorney fee obligations spent defending this adversary proceeding. He testified that with the exception of an increase in his retirement savings and the recent acquisition of household furniture, his assets at the time of trial were roughly the same as the assets listed in his bankruptcy schedules.

Dennison and her current husband live in a condominium valued at $70,000. No evidence was offered regarding their equity in the condominium. Her current husband owns a boat that he purchased with his son. No evidence was offered regarding its value, but approximately $9,000 is still owed on the boat. Dennison's husband also owns some land in Duschene, Utah, valued at approximately $2,000. Dennison has a 401(k) retirement account valued at approximately $30,000, a mutual fund valued at approximately $3,000, and about $4,000 in bonds that she has access to, but are intended for her children. She also has various annuities and IRA accounts valued at approximately $3,500. She purchased a computer about a year and a half ago for $4,000. The Court was presented with insufficient evidence to make a finding regarding the value of Dennison's current assets or liabilities.

### 5. Benefit and/or Detriment to the Parties from Discharging or Enforcing the HHEICO Debt

Very little evidence was offered regarding the benefit or detriment that would result to the parties if the HHEICO Debt was or was not discharged. Dennison's testimony was very general. The Debtor's wife testified that if the HHEICO Debt was not discharged, she and the Debtor could not pay their obligations. She further testified that the Debtor had a life

insurance policy on which she was the beneficiary. She believed if the HHEICO Debt was not discharged and the Debtor died, Dennison (and not she) would be entitled to the proceeds. She testified that the HHEICO Debt was a huge burden on her family both financially and emotionally. She voiced concern over the Debtor's and her ability to save for retirement and fund her children's college education if the HHEICO Debt was not discharged. The charitable contribution made by she and the Debtor was not considered by her to be available for payment to Dennison. She also indicated that she, as the individual who has paid the bills in the household during their five year marriage, had never considered paying Dennison any monthly payment on the HHEICO Debt because she had never received a bill.

### 6. Attorney's Fees

The parties agree that by the divorce court's Order and Judgment dated December 13, 1994 resulting from the Memorandum Decision, Dennison was granted $2,708.35 for attorney's fees and costs incurred in prosecuting the order to show cause. That award of attorney's fees accrues interest from December 13, 1994 at 5.61%.

The Debtor appealed the divorce court's decision to the Utah Court of Appeals, which, in a Memorandum Decision filed May 16, 1996, sustained the divorce court and remanded for a determination of attorney's fees awarded to Dennison as the prevailing party on appeal pursuant to Utah Code Ann. § 78–32–11. The Debtor's bankruptcy filing precluded a determination of the amount of the fees on remand.

In this proceeding, the attorney who represented Dennison in the appeal testified that his fees incurred from October 4, 1995 to May 23, 1996 in prosecuting the

---

11. The Debtor has not filed tax returns since 1991. He testified regarding his estimates of potential tax liability, including penalties and interest. Since his testimony regarding his prior income is so inconclusive, the Court will not place much weight upon his estimates of tax liability, except to acknowledge that some unknown amount is probably owed.

appeal were $4,492.90 with costs of $47.87. This Court has reviewed the itemization that contains the fees related to the appeal, as well as the testimony related thereto, and finds that the rates charged are consistent with rates charged by attorneys in this area, and that the time spent appears reasonable. Further, the Court determines that the costs itemized appear to have been actually incurred. Interest on the $4,540.77 accrues from May 16, 1996, the date of the Utah Code of Appeals Memorandum Decision, at 7.35%.

This Court has also previously awarded Dennison fees and costs as a discovery sanction. The Debtor objected to the affidavit representing those fees and costs. The Court has considered the objection and finds fees in the amount of $610.50 to be an appropriate discovery sanction.

## DISCUSSION

### 1. Jurisdiction

The Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 1334, 157(a) and D.U.Civ.R. 83–7.1. Venue is proper in this jurisdiction under 28 U.S.C. §§ 1408 and 1409(a). This proceeding to determine the dischargeability of a debt is a core proceeding pursuant to 28 U.S.C. § 157(b)(1)(I), and this court has jurisdiction to enter a final order.

### 2. Section 523(a)(5)

Dennison argues the HHEICO Debt is in the nature of support and is nondischargeable under 11 U.S.C. § 523(a)(5).[12] The Debtor claims that the HHEICO Debt is a property settlement award and is dis-

chargeable in bankruptcy. Alternatively, the Debtor asserts that even if the amounts claimed by Dennison were a support obligation, the obligation terminated upon Dennison's remarriage. Finally, the Debtor asserts that Dennison's claims are barred by proceedings and determinations in state court under theories of waiver, estoppel and res judicata.

Dennison bears the burden of proving by a preponderance of the evidence that the HHEICO Debt is not dischargeable under § 523(a)(5).[13] *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1489 (10th Cir.1995), *cert. denied*, 516 U.S. 916, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995). Exceptions to discharge are narrowly construed in order to effect the purpose of the Bankruptcy Code to provide the debtor a fresh start; but, the policy underlying § 523(a)(5) favors enforcement of support obligations over the debtor's fresh start. *Id.* "Support" under § 523(a)(5) is to be read broadly and in a realistic manner. *Jones v. Jones (In re Jones)*, 9 F.3d 878, 881–82 (10th Cir.1993).

Whether an obligation is "support" is factual and determined according to federal bankruptcy law. *Young v. Young (In re Young)*, 35 F.3d 499, 500 (10th Cir. 1994). Although state law provides guidance on this issue, " 'a debt could be in the 'nature of support' under section 523(a)(5) even though it would not legally qualify as alimony or support under state law.' " *Jones*, 9 F.3d at 880 (*quoting Yeates v. Yeates (In re Yeates)*, 807 F.2d 874, 878 (10th Cir.1986)).

---

**12.** Future references are to Title 11 of the United States Code unless otherwise indicated.

**13.** Section 523(a)(5) states, in relevant part, that:

(a) A discharge under section ... 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(5) to a ... former spouse ... of the debtor, for alimony to, maintenance for, or

support of such spouse ... in connection with a ... divorce decree ..., determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

. . . .

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance or support[.]

11 U.S.C. § 523(a)(5).

■ To determine whether the HHEICO Debt is nondischargeable under § 523(a)(5) the Court must make "a dual inquiry into both the parties' intent and the substance of the obligation." *Sampson v. Sampson (In re Sampson)*, 997 F.2d 717, 723 (10th Cir.1993). In other words, to declare the HHEICO Debt nondischargeable,

> First, the court must divine the spouses' shared intent as to the nature of the payment. This inquiry is not limited to the words of the settlement agreement, even if unambiguous. Indeed, the bankruptcy court is required to look behind the words and labels of the agreement in resolving this issue. Second, **if the court decides that the payment was intended as support,** it must then determine that the substance of the payment was in the nature of support at the time of the divorce—i.e., whether the surrounding facts and circumstances, especially financial, lend support to such a finding.

*Young*, 35 F.3d at 500 (citations omitted) (emphasis added). *Accord Dewey v. Dewey (In re Dewey)*, 223 B.R. 559, 564 (10th Cir. BAP 1998).

■ With respect to the first step, "the critical inquiry is the shared intent of the parties at the time the obligation arose" and "does not turn on one party's post hoc explanation as to his or her state of mind at the time of the agreement even if uncontradicted." *Sampson*, 997 F.2d at 723. " 'A written agreement between the parties is persuasive evidence of intent.' " *Id.* (*quoting Yeates*, 807 F.2d at 878).

■ For the following reasons, the Court concludes that Dennison has failed to meet her burden of proving by a preponderance of the evidence that the parties' intended the HHEICO Payments to be in the nature of support. The Decree was entered pursuant to the parties' stipulation and specifically and clearly provides that Dennison waived her right to alimony. The Decree, on its face, does not support Dennison's allegation that she waived alimony "in lieu" of increased HHEICO Payments. This constitutes persuasive evidence that at the time of the Decree, the parties did not intend the HHEICO Payments to be support. *See id.*

■ That the Decree did not award support payments is consistent with both the Debtor's and Dennison's recollection [14] that the Debtor was adamant that he would not pay alimony, maintenance or support. It is also consistent with the proposal in the Settlement Offer that the Debtor pay alimony of $235 per month, but that the alimony would be significantly reduced or cease as soon as the marital home was sold. Likewise, it is consistent with the Debtor's actions immediately after the Decree, when he refused to pay even the one-half (½) mortgage payment as ordered in the Decree. The fact that the HHEICO Payments do not cease upon Dennison's death, remarriage, or cohabitation, which is typical of support awards, is further evidence of the parties' intent, although, of course, not binding in this proceeding. *See Goin v. Rives (In re Goin)*, 808 F.2d 1391, 1393 (10th Cir.1987). *See also* Utah Code Ann. § 30–3–5(8)–(9) (providing that "[u]nless a decree of divorce specifically provides otherwise, any order of the court that a party pay alimony to a former spouse automatically terminates upon the remarriage of that former spouse" or "upon establishment by the party paying alimony that the former spouse is cohabitating with another person"). Finally, the Debtor's Settlement Offer indicates that the Debtor believed Dennison had an equity interest in the

---

14. Although, as set forth above, the Court recognizes that this determination does not turn on the parties' post hoc explanations or actions, because no contemporaneous evidence of the parties' intent at the time of the Decree (other than the Decree, itself) was offered, the Court finds these post-decree explanations helpful, although not dispositive, in determining what the parties intended at the time of the Decree.

HHEICO Contract and offered to divide the proceeds on that basis.

To contradict this evidence of the parties' shared intent are the following facts. Dennison testified that at the time of the Decree, she needed additional sums in order to make her one-half (½) payment of the mortgage on the marital home until it was sold and that even after the marital home was sold, she would probably have a shortfall. Three (3) years later the divorce court also indicated Dennison relied upon the HHEICO Payments for her support, as did her attorney in that proceeding.

The Court recognizes that "[an] obvious need for support at the time of the divorce is enough to presume that the obligation was intended as support even when it is otherwise identified in an agreement between the parties as property settlement." *Sampson*, 997 F.2d at 725. At the time of the Decree the Debtor had surplus income of $112 per month; whereas Dennison had a negative income of $560 per month. Viewed alone, this discrepancy in surplus income, though important to the parties, is not so disparate as to provide a significant showing of intent. *Id.* at 725 (plaintiff had no income and monthly living expenses of $4,165, and the defendant had income of $14,850 and expenses of $3,795.); *Yeates*, 807 F.2d 874, 879 (plaintiff was in dire financial circumstance at the time of the divorce). In addition, the fact of Dennison's shortfall in funds to meet her expenses is insufficient to rebut the evidence contained in the Decree, for as stated in *Sampson*, "[t]he fact that Defendant's obligation did not provide Plaintiff with all of her monthly living expenses at the time of the divorce is largely irrelevant as it is not uncommon that spouses must reduce their standard of living following a divorce." *Id.* at 724, n. 5. This case is unlike those in which the decree provides for the parties to retain the marital home, and payments in the nature of support are required to prevent the loss of the home. *Yeates*, 807 F.2d at 879. Instead, this case exemplifies a situation where it was necessary to reduce the parties' standard of living by liquidating a joint asset, the marital home, because the debt service was simply too great for the parties to bear after divorce.

The Court must view the totality of the evidence to determine the parties' shared intent. The Court is also well aware of the arguable shift of position that the parties have evidenced since the Decree was entered and their attempts in this proceeding to use that as evidence regarding intent. Although claiming he would never pay alimony, the Debtor encumbered the HHEICO Contract, coincidentally, just after Dennison remarried, suggesting he may have viewed the HHEICO Payments as support. Dennison, on the other hand, arguably treated the obligation as a property settlement in the subsequent order to show cause proceedings.[15] However, the parties intent is determined at the time of the Decree. The parties legal positioning thereafter is of little probative evidence of their shared intent in May of 1991.

In consideration of: 1) the clear language of the Decree; 2) the Debtor's stated position and Dennison's acknowledgment of his refusal to pay alimony; 3) the provisions in the Settlement Offer; 4) the parties' belief that Dennison held a property interest in the HHEICO Contract; 5) the relative financial circumstances of the parties and Dennison's shortfall in income; 6) Dennison's belief that she needed the HHEICO Payments for support; and, 7) the subsequent divorce court findings that Dennison needed the HHEICO Payments for her support, the Court finds the parties did not share an intent that the HHEICO Payments were in the nature of support. The weight of this evidence is insufficient for Dennison to carry her burden of proof

---

15. Although at the time of the order to show cause proceeding before the divorce court, Dennison had remarried, neither side raised the issue of whether the HHEICO Payments were in the nature of support and terminated upon remarriage. Both apparently believed they were in the nature of a property settlement and proceeded accordingly.

under § 523(a)(5). Since Dennison has not met the first prong of the two part test in *Sampson*, this Court need not, an probably should not, resolve the second prong of the test.

■ Because the Court concludes that the HHEICO Payments were not in the nature of support as required by § 523(a)(5), the Court need not decide either the Debtor's arguments regarding judicial estoppel and res judicata.[16] The Debtor's assertion that this Court should consider that any support that Dennison was entitled to by way of the HHEICO Payments terminated upon her remarriage is simply an incorrect interpretation of the law. This Court is to consider all the relevant factors and is not bound by whether the obligation would be support under state law. *See Sampson*, 997 F.2d at 720 (even though debtor's obligation for payments continued regardless of whether the ex-wife remarries, the court still found the obligation to be support). However, because the Court finds that the HHEICO Debt is not in the nature of support, it need not reach Debtor's argument that the HHEICO Payments terminated upon Dennison's remarriage.

### 3. *Section 523(a)(15)*

Dennison argues that, in the event the Court determines the HHEICO Debt is not in the nature of support, it is nondischargeable pursuant to § 523(a)(15). Section 523(a)(15) provides that an individual is not discharged from any debt:

not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 512(a)(15). This section of the Code was enacted in 1994 and intended to cover divorce-related debts, like property

---

**16.** The Court, however, notes that the Tenth Circuit has rejected the doctrine of judicial estoppel in most cases and the Debtor has not shown that the narrow exception applies in this case. *Golfland Entertainment Centers, Inc. v. Peak Investment, Inc. (In re BCD Corp.),* 119 F.3d 852, 858 (10th Cir.1997) (Judicial estoppel only applies if the party adopting the inconsistent position had actually succeeded in the earlier litigation, and the party asserting judicial estoppel has demonstrate a detrimental change in its position as a result of reasonable reliance on that conduct.) Res judicata is inapplicable because this court is not confined to a review of the judgment and record in the state court proceeding when determining the dischargeability of a debt. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). However, to the extent collateral estoppel may apply, the Debtor must show (1) the issue to be precluded is the same as the one litigated in the earlier state proceeding; (2) the issue was actually litigated in the prior proceeding; and (3) the state court's determination of that issue was necessary to the resulting final and valid judgment. *Nelson v. Tsamasfyros (In re Tsamasfyros),* 940 F.2d 605, 606–07 (10th Cir. 1991). The issue in the order to show cause proceeding was whether the Debtor willfully and intentionally violated the Decree by encumbering the HHEICO Contract without Dennison's consent or knowledge. Whether the stream of payments constituted maintenance or support, or whether they were a property settlement was not the issue litigated in the order to show cause proceeding and was not necessary to a judgment issued by the divorce court. In addition, as of the date of the filing of the Debtor's petition, the parties continued to litigate the divorce court order that had been remanded by the Utah Court of Appeals.

settlement agreements, that "should not justifiably be discharged." King, *Collier on Bankruptcy* ¶ 523.21. The House Committee's Judiciary Report regarding § 523(a)(15) provides, in pertinent part:

In some instances, divorcing spouses have agreed to make payments of marital debts, holding the other spouse harmless from those debts, in exchange for a reduction in alimony payments. In other cases, spouses have agreed to lower alimony based on a larger property settlement. If such "hold harmless" and property settlement obligations are not found to be in the nature of alimony, maintenance or support, they are dischargeable under current law. The nondebtor spouse may be saddled with substantial debt and little or no alimony or support. This subsection will make such obligations nondischargeable in cases where the debtor has the ability to pay them and the detriment to the nondebtor spouse from their nonpayment outweighs the benefit to the debtor of discharging such debts. In other words, the debt will remain dischargeable if paying the debt would reduce the debtor's income below that necessary for the support of the debtor and the debtor's dependents. The Committee believes that payment of support needs must take precedence over property settlement debts. The debt will also be discharged if the benefit to the debtor of discharging it outweighs the harm to the obligee. For example, if a nondebtor spouse would suffer little detriment from the debtor's nonpayment of an obligation required to be paid under a hold harmless agreement (perhaps because it could not be collected from the nondebtor spouse or because the nondebtor spouse could easily pay it) the obligation would be discharged. The benefits of the debtor's discharge should be sacrificed only if there would be substantial detriment to the nondebtor spouse that outweighs the debtor's need for a fresh start.

H.Rep. No. 103–835, 103rd Cong., 2nd Sess. 54, *reprinted in* 1994 U.S.Code Cong. & Admin.News 3363. Although this Court is unaware of, and the parties have not cited to, any decision by the Tenth Circuit interpreting § 523(a)(15), other circuits have thoroughly analyzed the section as set forth below.

Under § 523(a)(15), the initial burden of proof is on the plaintiff, by a preponderance of the evidence, to "establish that the debt is within the purview of subsection (15) by demonstrating that it does not fall under § 523(a)(5) and that it nevertheless was incurred by the debtor in the course of the divorce or in connection with a divorce decree or similar agreement." *In re Crosswhite*, 148 F.3d 879, 884 (7th Cir.1998). The burden then shifts to the Debtor to prove, by a preponderance of the evidence, one of the exceptions to nondischargeability set out in § 523(a)(15)(A) and (B). *Id.* at 884–85. *See also Gamble v. Gamble (In re Gamble)*, 143 F.3d 223, 226 (5th Cir.1998) (upholding bankruptcy court's assignment of "the initial burden of showing that § 523(a)(15) was applicable to the debt in question" to the plaintiff and then assigning "the burden of proving that one of the exceptions applied to take it out" to the debtor); *In re Jodoin*, 209 B.R. 132, 140 (9th Cir. BAP 1997) ("once the Plaintiff demonstrates that the [d]ebtor incurred the debt in connection with divorce, the burden shifts to the [d]ebtor to prove subparts (A) and (B)"); *In re Moeder*, 220 B.R. 52, 56 (8th Cir. BAP 1998) ("the burden of proof lies with the debtor to show that an exception to nondischargeability under § 523(a)(15)(A) or (B) applies in a given case"); *Hart v. Molino (In re Molino)*, 225 B.R. 904, 907 (6th Cir. BAP 1998) ("The objecting creditor bears the burden of proof to establish that the debt is of a type excepted from discharge under § 523(a)(15). Once the creditor has met this burden the burden shifts to the debtor to prove either of the exceptions to nondischargeability contained in subsections (A) or (B).").

This allocation of burden under § 523(a)(15) has also been adopted by bankruptcy courts within the Tenth Circuit. *See e.g. Slover v. Slover (In re Slover),* 191 B.R. 886, 891 (Bankr.E.D.Okla. 1996) ("the language in § 523(a)(15) has been described by courts as establishing a rebuttable presumption that any property settlement obligation arising from a divorce is nondischargeable unless the debtor can prove one of the two things set forth in § 523(a)(15)(A) or (B)"); *Simons v. Simons (In re Simons),* 193 B.R. 48, 50 (Bankr.W.D.Okla.1996) (same). *But see Johnson v. Johnson (In re Johnson),* 212 B.R. 662, 666 (Bankr.D.Kan.1997) ("However, this Court finds that once the debtor has shown the benefit of a discharge under § 523(a)(15)(B), the nondebtor spouse has the burden of production with regard to the detrimental consequences to the nondebtor spouse.").

Dennison has shown, by a preponderance of the evidence, that the HHEICO Debt does not fall under § 523(a)(5). Nevertheless, Dennison has proven that the HHEICO Payments were a debt incurred by the Debtor in the course of a divorce and pursuant to a divorce decree. The Court therefore concludes that the HHEICO Debt is nondischargeable unless the Debtor can prove either of the exceptions set forth in § 523(a)(15)(A) or (B).

■ The Court concludes that the Debtor has shown that he does not have property available to satisfy the obligation owed to Dennison. However, he has not shown that he does not have the ability to pay the HHEICO Debt from his income not reasonably necessary for the maintenance or support of the debtor or a dependent of the debtor. Although the Debtor has few assets, he has discretionary income, not necessary for the maintenance or support of the debtor or a dependent of the debtor at the time of trial of $1,186 per month. *See Jodoin,* 209 B.R. at 142 ("the appropriate time to apply [523(a)(2)(A) ] is at the time of trial and not at the time of the filing of the petition"). *See also Gam-*

*ble,* 143 F.3d at 226 (considering new wife's contribution to household income under § 523(a)(15)(A)).

■ The Court cannot conclude that contributions made by the Debtor and his spouse to their respective 401(k) retirement plans are "reasonably necessary for maintenance or support." *Collins v. Hesson (In re Hesson),* 190 B.R. 229, 237–38 (Bankr.D.Md.1995) (excluding monthly contribution to 401(k) retirement fund from disposable income test under § 523(a)(15)(A)). *See also Haughey v. Haughey (In re Haughey),* 226 B.R. 284 (10th Cir. BAP 1998) (upholding bankruptcy court's exclusion of voluntary contributions to the debtor's thrift savings plan from determination of disposable income under § 523(a)(15)(A)).

■ Neither can the Court conclude that charitable contributions made by the Debtor and his spouse are "reasonably necessary for maintenance or support." *See e.g. Molino,* 225 B.R. at 908 ("Taking a voluntary retirement and working in a voluntary position for the church or a charitable or civic institution is a luxury many people would like to be able to afford. Debtor is not prohibited from making such life-choice decisions, but he cannot do so in order to render himself a pauper ... while seeking the protection of the bankruptcy court as a means to avoid those support obligations.") Had Congress intended to allow charitable contributions to be factored into income reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor, it would have so stated. *See* PL 105–183 (S 1244), June 19, 1998 (amending 11 U.S.C. § 1325(b)(2)(A), and not 11 U.S.C. § 523(a)(15)(A) to exclude charitable contributions not to exceed fifteen percent (15%) of the gross income of the debtor from disposable income). The negative pregnant rule of statutory construction requires that an express statutory statement, such as the amendments to § 1325(b)(A), contrasted with statutory si-

lence regarding including charitable contributions in § 523(a)(15)(A), shows an intent to confine the allowance of charitable contributions to § 1325(b)(A). *Field v. Mans*, 516 U.S. 59, 66, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) *citing Gozlon–Peretz v. United States*, 498 U.S. 395, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (citations omitted). *But see Jodoin*, 209 B.R. at 142 (pre–1998 case applying disposable income test of 11 U.S.C. § 1325(b) to § 523(a)(15)(A)).

■ The HHEICO Debt owed by the Debtor to Dennison, plus interest and attorneys fees awarded by the state courts exceeds $80,000. The Court concludes that given the Debtor has a monthly surplus of $1,186 over and above what is reasonably necessary for maintenance or support, the Debtor has failed to meet his burden under § 523(a)(15)(A). The focus is on whether the Debtor can make reasonable payments on the debt from his disposable income, not merely the availability of a lump sum equal to the amount of the debt. *Gamble*, 143 F.3d at 226 (nothing that "the plain language of the statute speaks of an 'ability to pay … from income' as well as from property") (*quoting* 11 U.S.C. § 523(a)(15)(A)). *See also Jodoin*, 209 B.R. at 142. The Court so concludes. Monthly payments of even $1,000 would pay interest at the federal judgment rate, currently at 4.616 percent, plus a substantial payment to reduce the principle each year.

■ An assessment of benefit and detriment under § 523(a)(15)(B) "implicates an analysis of the totality of the circumstances, not just a comparison of the parties' relative net worths." *Gamble*, 143 F.3d at 226; *Crosswhite*, 148 F.3d at 888 ("the bankruptcy courts have developed a 'totality of the circumstances' test as the general method for weighing benefit and

detriment" under § 523(a)(15)(B)). Some courts have explained that " 'the best way to apply the 11 U.S.C. § 523(a)(15)(B) balancing test is to review the financial status of the debtor and the creditor and compare their relative standards of living to determine the true benefit of the debtor's possible discharge against any hardship the … former spouse .. would suffer as a result of the discharge.' " *Molino*, 225 B.R. at 908–09 (*quoting In re Smither*, 194 B.R. 102, 111 (Bankr.W.D.Ky.1996)).

■ The Court has considered the evidence presented by the parties relating to the eleven (11) factors set forth in *Molino* case. *See Molino*, 225 at 909 (listing eleven (11) factors). The evidence that was produced shows nothing that would indicate the benefit to the Debtor of discharging this debt outweighs the detrimental consequence to Dennison. From the limited evidence presented, Dennison does not have a lifestyle superior to that of the Debtor. Her future security is impacted by her husband's medical condition and inability to obtain insurance. The combined gross income of Dennison and her husband is $4,920, while the combined net income of the Debtor and his wife is $4,340. The expenses of the Debtor, including the care of his dependents, payment of reaffirmed debt and his wife's obligations, still leave a substantial surplus. No evidence was provided regarding Dennison's surplus income at the time of trial. Thus, the Court cannot conclude that repayment of the debt would reduce the Debtors standard of living below that of Dennison. *Molino*, 225 B.R. at 909. It would only reduce his ability to provide for his future retirement.

In fact, the evidence presented indicates the only significant difference between the parties' assets is the amount of retirement savings Dennison has been able to accumulate and the fact that Dennison owns, as opposed to rents, her residence (although the Court does not know the value of Dennison's ownership interest in her con-

dominium). Dennison will not be penalized for her diligence in accumulating a modest retirement fund, so that the Debtor may fund his. This is especially so since the Debtor has never, since he borrowed against the HHEICO Contract for the gold mine investment in 1992, made any attempt to repay the obligation. The fact that the HHEICO Debt has now accrued substantial interest is directly attributable to the Debtor's choices. Insufficient evidence was provided with respect to Dennison's financial status and standard of living for the Court to make any determination that, under the balancing test, the HHEICO Debt should be discharged. The Court therefore concludes, like the *Molino* court, that the Debtor has failed to meet his burden under § 523(a)(15)(B). *Molino*, 225 B.R. at 909–10.

### 4. *Attorney's Fees*

■ Attorneys fees owing to Dennison's attorney in the order to show cause proceeding were liquidated prepetition through the divorce court's December 13, 1994 Order and Judgment, in the amount of $2,708.35. That liquidated figure is part of Dennison's prepetition claim and is calculated, with interest at 5.61% to be $3,309.41 as of the date of this Memorandum Decision. *See* Utah Code Ann. § 15–1–4(2). Dennison was also awarded her attorneys fees for the appeal, and such an award, though unliquidated, was a "debt" as defined in § 101(12) as of the date of filing. This Court has now liquidated that "right to payment" in the amount of $4,492.90 in fees and $47.87 in costs. The total of the appeal fees and costs, with interest at 7.35% is $5,400.72 as of the date of this Memorandum Decision. *See* Utah Code Ann. § 15–1–4(2). Those fees are also part of the prepetition debt owed to Dennison that was incurred by the Debtor "in connection with ... a divorce decree or other order of a court of record" that is nondischargeable pursuant to § 523(a)(15).

■ For the Debtor to be required to pay Dennison's attorney fees for this proceeding, there must be an underlying basis for the award cognizable in federal court. "Under the 'American Rule', in cases brought upon or involving federal law, attorneys' fees are ordinarily not recoverable absent a specific statutory authority, a contractual right or aggravated conduct." *Collins v. Florez (In re Florez)*, 191 B.R. 112, 116 (Bankr.N.D.Ill.1995). Section 523(a)(15) does not specifically provide that the prevailing party will be awarded attorneys fees. *Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (attorney fees and costs provided in New Jersey Consumer Fraud Act awarded because they constituted part of debt to the extent obtained by fraud). The Decree does not contain a provision allowing for reasonable expenses incurred in enforcing the Decree. *Armstrong v. Armstrong (In re Armstrong)*, 205 B.R. 386, 394 (Bankr.W.D.Tenn.1996) (pursuant to fee provision in decree, creditor was entitled to reasonable attorney fees for suing to except debtor's hold harmless obligation from discharge under § 523(a)(15)). This Circuit has agreed that "attorney fees incurred and awarded in child custody litigation should ... be considered as obligations for 'support,' at lease in the absence of clear indication of special circumstances to the contrary." *Jones v. Jones (In re Jones)*, 9 F.3d 878, 881 (10th Cir.1993) *citing Holtz v. Poe (In re Poe)*, 118 B.R. 809, 812 (Bankr. N.D.Okla.1990). However, in *Jones*, the fees were awarded by the state court prepetition and thus have a basis for award independent of the American Rule. We have found no case law, contractual or statutory basis for an award of Dennison's attorney fees incurred in prosecuting this proceeding, and therefore deny the same.

### CONCLUSION

For the foregoing reasons, the Court concludes that the HHEICO Debt owed to Dennison by the Debtor, including prepetition attorney fees awarded by the state divorce court and Utah Court of Appeals,

and liquidated in this proceeding, as well as sanction awards, are not dischargeable under 11 U.S.C. § 523(a)(15). Judgment shall issue accordingly.