In re Clarence WHITE, Debtor.

Arlene Chance, Plaintiff,

v.

Clarence White, Defendant.

Bankruptcy No. 00–41908–BJH–7.
Adversary No. 00–4163.

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Aug. 7, 2001.

Mark Petrocchi, Colvin & Petrocchi, Fort Worth, TX, for Arlene Chance.

Behrooz Vida, Venable & Vida, Bedford, TX, for Clarence White.

### MEMORANDUM OPINION

BARBARA J. HOUSER, Bankruptcy Judge.

This Complaint to Determine Dischargeability of Debt was tried on July 11, 2001. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding in accordance with 28 U.S.C. § 157(b). This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law. FED. R.CIV.P. 52; FED. R. BANKR.P. 7052.

## I. Background Facts and Contentions of the Parties

Arlene Chance ("Chance") and Clarence White ("Debtor" or "White") were divorced pursuant to a final decree signed by a Tarrant County state court on February 26, 1996 (the "Final Decree"). *See* Exhibit P–1. Pursuant to the Final Decree, Chance was awarded 23.9% of White's U.S. Air Force retirement benefits (the "Retirement Benefits"). *See* Exhibit P–1 at 15. The Retirement Benefits will be paid to White monthly until his death. A Qualified Domestic Relations Order United States Air Force ("QDRO") was signed by the state court on May 1, 1996, pursuant to which Chance was assigned 23.9% of the Retirement Benefits. *See* Exhibit P–2. Unfortunately, the Air Force refused to honor the QDRO because Chance and White were not married for 10 years during White's military service, *see* Pretrial Order, ¶ 9, and the QDRO recited that it represented a division of marital property instead of support for Chance. *See* Exhibit P–2, ¶ 4. As a result of the Air Force's refusal to honor the QDRO, White received 100% of the Retirement Benefits monthly and he refused to turn over the share due to Chance pursuant to the Final Decree.

On February 3, 1998, an "Order on Movant's Motion for Enforcement and Respondent's Motion to Modify" (the "Enforcement and Modification Order") was signed by the state court pursuant to which White was ordered to turn over to Chance, monthly, her share of the Retirement Benefits—the sum of $244.73 per month. *See* Exhibit P–18 at 3. Moreover, White was found to be "in arrears in the sum of $5,139.33 as of November 21, 1997[1] for failure to pay directly to Arlene White the military retirement benefits awarded to Arlene White in the Final Decree of Divorce...." *See* Exhibit P–18 at 2. However, the state court also modified the Final Decree to award White retroactive child support because the minor child had begun to live with White. *See* Exhibit P–18 at 2. After crediting the amounts found to be owing to Chance with the amounts found to be owing to White, the state court awarded a judgment of $615.83 in favor of Chance. *See* Exhibit P–18 at 3.

However, notwithstanding the entry of the Enforcement and Modification Order, White still refused to turn over to Chance her 23.9% share of the monthly payments that he received. On April 13, 1998, White and Chance appeared before a state court Master on Chance's motion for contempt.

---

1. The state court thus found that White had made no payments to Chance since the Final Decree was entered 21 months earlier (the monthly payment due to Chance of $244.73 from the Retirement Benefits × 21 months = $5,139.33).

At that time, White was found to be in contempt of the Enforcement and Modification Order. *See* Exhibit P–22.

White testified that he requested a modification of the Enforcement and Modification Order from the Master in connection with the April 1998 proceedings so that he would be able to deduct the monies he paid to Chance from his total income on his federal income tax return. That testimony is consistent with the notes of the Master as set forth in the "Master's Recommendations for Contempt" (the "Master's Recommendations"). *See* Exhibit P–22. The Master's Recommendations notes the agreement of White and Chance that the Enforcement and Modification Order

should be modified to properly report each party's benefit from the military retirement payment that is received on the 1st of each month by [White]. The following language shall be added to page 3, line 18 of the [Enforcement and Modification Order]: For purposes of Federal Income Tax, beginning with the January 1, 1998 payment, Arlene Chance is Ordered to report as income the monthly benefit (23.9% of the total sum received by Respondent) received from Clarence White as payment in full of such obligation, for each tax year beginning in 1998 and each year thereafter so long as such benefit is paid. It is Further Ordered and Decreed that Clarence White shall be authorized to deduct the total sum of money payable to Arlene Chance but received by Clarence White that is forwarded to Arlene Chance from his total earnings, thereby proportionately lowering Respondent's AGI.

Exhibit P–22 at 1. After noting the agreement of White and Chance and reciting the necessary modification to the Enforcement and Modification Order to accommodate that agreement, the Master found that White "is in arrears on the military retirement payment in the amount of $1,223.65 as of April 13,1998"[2] and further found that Chance has a judgment in the amount of $615.83 that had not been paid. *See* Exhibit P–22 at 1–2. After awarding Chance her costs, the Master noted that the "parties agree that $2,184.48 can be deducted from Clarence White's checking and/or savings account that has been temporarily frozen, in order to fully pay the agreed upon debts and costs." *See* Exhibit P–22 at 2.

However, once again, White refused to make further monthly payments to Chance, and on April 14, 2000, White filed this bankruptcy case. From the entry of the Final Decree in February 1996 through the date this bankruptcy case was filed (and after taking into consideration the credits to which White was entitled pursuant to the Enforcement and Modification Order), White apparently made a total of seven monthly payments to Chance—November 1997 in open court in connection with the Enforcement and Modification Order; December 1997 through April 1998, pursuant to the deduction from White's account as set forth in the Master's Recommendations; and another payment (the timing of which the Court cannot determine from this record). However, the parties agree that as of June 30, 2001, White owes Chance monthly payments totaling $8,810.23 (the "Debt"),[3] and

2. Thus, the Master found that White had not made any payments to Chance after the November 1997 payment that he was ordered to make in open court by the state court during proceedings in connection with the entry of the Enforcement and Modification Order (De-

cember 1997—April 1998 or 5 months × $244.73 = $1,223.65).

3. Independently, the amount owing can be calculated as follows: 64 monthly payments (March 1996 (the month following the Final

that the Debt will increase each month by $244.73 until White's death.

Chance contends that the Debt is non-dischargeable support pursuant to 11 U.S.C. § 523(a)(5). Chance further contends that she is entitled to recover the reasonable attorneys' fees and costs she has incurred in attempting to collect the Debt and in bringing this action (totaling in excess of $9,000.00 at the time of trial) from White as part of the nondischargeable support obligation.

White contends that the award to Chance of a portion of the Retirement Benefits was, as recited in the Final Decree, a division of marital property—not an award of support to Chance. As such, White contends that the Debt is not excepted from discharge by 11 U.S.C. § 523(a)(5). Rather, White contends that the issue presented is whether the Debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(15) as a non-support debt incurred pursuant to the Final Decree. In this regard, White contends that discharging the Debt would result in a benefit to him that outweighs any detrimental consequence to Chance. White further contends that he is entitled to recover the reasonable attorneys' fees and costs he has incurred in defending against this complaint.

In response, Chance contends that if the Court concludes that the Debt represents a division of property instead of a support obligation, White failed to carry his burden

of proof under 11 U.S.C. § 523(a)(15), and that the Debt is therefore excepted from discharge pursuant to that section of the Bankruptcy Code.

## II. Legal Analysis

### A. Does the Debt Represent a Support Obligation?

■ For the Debt to be excepted from discharge pursuant to § 523(a)(5) of the Bankruptcy Code, the Court must find that the Debt was "for alimony to, maintenance for, or support of" Chance, White's former spouse. *See* 11 U.S.C. § 523(a)(5). Chance bears the burden of proof and must establish that the Debt represents a support obligation by a preponderance of the evidence. *See Hudson v. Raggio & Raggio, Inc. (In re of Hudson)*, 107 F.3d 355, 356 (5th Cir.1997) ("Whether a particular debt is a support obligation, excepted from discharge under 11 U.S.C. § 523(a)(5) is a question of federal bankruptcy law, not state law. Plaintiff [non-debtor] Raggio has the burden of proving by a preponderance of the evidence that this debt is non-dischargeable. Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start.") (citations omitted); *Schwartz v. Schwartz (In re Schwartz)*, 217 B.R. 533, 534 (Bankr.E.D.Tex.1998)

Decree) through June 2001) × $244.73 = $15,662.72. Chance was "paid" (i) $4,523.50 through a credit against what was owing to her as of November 1997 pursuant to the Enforcement and Modification Order; (ii) $244.73 (representing the November 1997 payment) in open court in connection with the Enforcement and Modification Order; (iii) $615.83 (the net judgment awarded to Chance in the Enforcement and Modification Order) through the agreed deduction from White's frozen bank account as noted in the

Master's Recommendations; and (iv) $1,223.65 through the agreed deduction from White's frozen bank account as noted in the Master's Recommendations, for total payments or credits of $6,607.71. Based on this analysis, the amount still owing to Chance as of June 30, 2001 would be $9,055.01 ($15,662.72 − $6,607.71 = $9,055.01). In light of the parties' stipulation, the Court concludes that White must have made one additional payment to Chance. The record does not reflect when this payment was made.

("However, a party seeking to show non-dischargeability of a debt pursuant to this section [523(a)(5) ] still has the burden of proving by a preponderance of the evidence that this debt is nondischargeable.").

The fact that the Final Decree characterizes the award of a portion of the Retirement Benefits to Chance (and hence, the Debt which arises from White's failure to turn over Chance's share of the Retirement Benefits to her) as a division of marital property is not controlling. The Court can "determine the true nature of the debt, regardless of the characterization placed on it by the parties' agreement or the state court proceeding. The bankruptcy court may, therefore, consider extrinsic evidence to determine the real nature of the underlying obligation in order to determine its dischargeability." *Benich v. Benich (In re Benich)*, 811 F.2d 943, 945 (5th Cir.1987). Factors that courts consider when determining the true nature of the underlying obligation include: (i) the disparity in earning power of the parties, (ii) the relative business opportunities of the parties, (iii) the educational background and probable future need for support of the spouse who receives payments, (iv) the relative physical condition of the parties, (v) the fault for the breakup, and (vi) the benefits the innocent spouse would have received had the marriage continued. *See Dennis v. Dennis (In re Dennis)*, 25 F.3d 274, 279 (5th Cir.1994); *In re Benich*, 811 F.2d at 945; *Nunnally v. Nunnally (In re Nunnally)*, 506 F.2d 1024, 1026 (5th Cir. 1975), *reh'g denied*, 509 F.2d 576 (5th Cir. 1975).

At trial, Chance testified that she thought she was awarded 23.9% of the Retirement Benefits to provide for her support—not that the award was a division of the marital estate. Not surprisingly, White testified that the award was, as set forth in the Final Decree, a division of the marital estate. As is obvious, each former spouse testified consistent with her/his own economic interest. The Court does not find either former spouses' testimony, standing alone, particularly compelling. Thus, the Court will examine the objective facts surrounding the divorce to attempt to ascertain the true nature of the obligation at issue here.

Chance and White agreed to the terms of their divorce at approximately 6:00 p.m. on February 20, 1996 after "a long day" of court proceedings. *See* Exhibit P–4 at 2. That agreement was announced on the record before the state court and was then incorporated into the Final Decree signed by the state court on February 26, 1996. *See* Exhibit P–1. Based upon a review of the transcript where the Rule 11 agreement of the parties was placed on the record, the Court finds that after a long day of discussion, White and Chance finally reached an agreement regarding the major economic terms of their divorce. *See* Exhibit P–4. The only obligation described to the state court as "support" on that day when the negotiations were fresh in all parties' minds was the child support obligation imposed on White for the minor child. *See id.* The balance of the transcript details how the marital property, including the Retirement Benefits, will be divided and who will be responsible for which marital debts. *See id.* When entered, the Final Decree was consistent with the representation of the parties' lawyers on the record on February 20, 1996— the award of 23.9% of the Retirement Benefits to Chance was characterized as a division of marital property in the Final Decree. *See* Exhibit P–1 at 15.

At the time of the divorce, White was earning more money than Chance. White's reported adjusted gross income in

1996 was $47,453.00[4] as compared with Chance's reported adjusted gross income of $31,647.00. *See* Exhibits P–6 and P–10. However, to fairly compare 1996 monetary resources, Chance was to receive approximately $6,000.00 of child support from White. That payment would reduce White's available income to approximately $41,453.00 and would increase Chance's available resources to approximately $37,647.00.[5] In 1997, White had adjusted gross income of $49,595.00 compared to Chance's adjusted gross income of $35,636.00. *See* Exhibits P–7 and P–12. In 1998, White had adjusted gross income of $51,205.00 compared to Chance's adjusted gross income of $33,010.00. *See* Exhibits P–8 and P–14. In 1999, White had adjusted gross income of $53,716.00. *See* Exhibit P–9. In 2000, Chance had adjusted gross income of $50,308.00. *See* Debtor's Exhibit B.

Thus, while White earned more money from his employment than Chance earned from her employment for several years following the divorce, Chance currently earns a higher salary than White. However, White's adjusted gross income exceeds Chance's adjusted gross income due to the Retirement Benefits.

Chance enjoys more opportunity for monetary advancement in her employment currently than White does. Chance holds a masters degree in education and is a vice-principal at an elementary school in the Fort Worth Independent School District. She has held that position for several years and is currently qualified to advance to a principal position with a higher income potential. White holds a bachelors degree in aviation management and works for the DFW International Airport Board, where he worked at the time of the divorce. White testified that he has little room for monetary advancement. While he is working on his masters degree, he does not expect significant monetary rewards to result from that advanced degree. Both White and Chance testified that they are in good health.

In summary, both parties are well educated, articulate, and in good health. Both parties enjoy comparable levels of income currently, with Chance having more opportunity for economic advancement. On this record, it is not possible to assess who was at fault in the breakup.[6]

If the evidence raised no other issues, the Court would find that Chance failed to carry her burden of proof that the award of 23.9% of the Retirement Benefits (and thus, the Debt) was intended to provide for her support. Chance is a well educated woman who was working in her chosen field at the time of the divorce and has continued to work in her chosen field since that time. She enjoyed a good salary at

---

**4.** In each year where White's adjusted gross income is stated, from $13,462.08 (in 1996) to $14,864.94 (in 1999) of that income was derived from the Retirement Benefits. White's salary from the DFW Airport Board was $33,972.76 in 1996 (*see* Exhibit P–6), $35,656.59 in 1997 (*see* Exhibit P–7), $37,961.36 in 1998 (*see* exhibit P–8), and $38,851.25 in 1999 (*see* Exhibit P–9).

**5.** Chance remarried in October 1996. She has continued to file a separate tax return notwithstanding her married status. Chance's current husband works, making the household a two income family. Chance tes-

tified that her husband earns between $27,000.00 and $30,000.00 annually. White has not remarried.

**6.** While Chance testified that she had been physically abused during the marriage, she did not testify regarding the reasons for the divorce or who was at fault. The divorce petition recites that the marriage had "become insupportable because of discord or conflict of personalities" and that White "was guilty of cruel treatment" of Chance. *See* Exhibit P–3 at 2.

the time of the divorce and has continued to enjoy a good salary. There is no indication that the parties thought that Chance would need to be "supported" at the time the Final Decree was signed.

However, the evidence raises one final, and ultimately controlling, issue to be addressed. In April 1998, White requested that his obligation to Chance be characterized in such a way that he would be able to deduct payments to her from his total income on his federal income tax returns. Chance agreed to that request and thus, the Master recommended that certain language be added to the Enforcement and Modification Order such that starting in January 1998, White would be entitled to deduct payments to Chance on his federal income tax returns, thereby reducing his total income, and Chance would be required to report payments from White as income, thereby increasing her total income. *See* Exhibit P–22. In fact, in connection with his 1998 income tax return, White reduced his total income by $979.00, claiming that amount as "alimony paid" to Chance.[7] *See* Exhibit P–8. Thus, White paid federal income tax in 1998 on a reduced adjusted gross income. *See id.* Chance did not report the $979.00 paid by White to her in 1998 as income on her 1998 federal income tax return. *See* Exhibit P–14. However, she did report $250.00 of alimony as having been paid to her in 1998.[8] *See id.*

In *Davidson v. Davidson (In re Davidson)*, 947 F.2d 1294 (5th Cir.1991), the Fifth Circuit applied "quasi estoppel" to forbid a party from accepting the benefits of a characterization of periodic payments in a divorce settlement as alimony and then subsequently taking an inconsistent position in his bankruptcy case to "escape the bankruptcy effects of his election to treat the payments as alimony." *Id.* at 1297. Specifically, the Fifth Circuit concluded that

> [t]o allow a spouse to set up an intricate and unambiguous divorce settlement, carefully distinguishing certain periodic payments, called alimony, from the division of marital property, and consistently taking advantage of this characterization for tax purposes, only then to declare that the payments truly represented a division of property, would be a legal affront to both the bankruptcy and tax codes. To uphold the discharge of those payments in bankruptcy would reward an admitted manipulation tantamount, at best, to deception. That Mr. Davidson did not know he would go broke when he agreed to the divorce settlement is not an uncommon scenario, but offers him no excuse for discharging the payments he chose to characterize as alimony.

*Id.*

After considering all of the evidence, the Court finds that the Retirement Benefits

---

7. The $979.00 payment deducted by White on his 1998 income tax return is consistent with the four payments made in 1998 pursuant to the "agreed" deduction from his frozen bank account noted in the Master's Recommendations (payments for January 1998–April 1998). *See* Exhibit P–22 at 2. The two payments made in 1997 were not deducted because the agreement to characterize the payments as support became effective on January 1, 1998.

8. Although there is no way of knowing for sure from the record, the Court infers that this amount may represent the "missing" seventh payment, *see* fn. 3, *supra*, and that Chance may not have reported the other four payments made in 1998 as "income" because they were collected through a contempt order. Of course, that is not correct and to be consistent with the position advanced at trial here, Chance would be required to amend her 1998 income tax return to reflect all payments received from White, voluntary or involuntary, as part of her total income.

were initially divided as part of the marital estate and Chance was to receive her share of this property directly from the Air Force. However, as noted previously, the Air Force refused to honor the parties' agreement as set forth in the Final Decree and the QDRO. Thereafter, pursuant to the Enforcement and Modification Order (entered in February 1998), White was ordered by the state court to pay to Chance her share ($244.73) of the monthly payment he received from the Air Force. Unhappy that he would not be able to deduct his monthly payments to Chance from his total income if the payment was still a division of the marital estate instead of alimony or support, White requested and received an agreement from Chance to recharacterize future payments as being in the nature of support or alimony. In April 1998, the Master recommended approval of the parties' agreement and proposed certain modifications to the Enforcement and Modification Order that would make White's payments to Chance after January 1, 1998 deductible by White from his total income and reportable by Chance as part of her income. White then took the benefit of his requested recharacterization of the payments when he filed his 1998 income tax return and deducted $979.00 as "alimony paid" to Chance.

Now recognizing the bankruptcy implications of his request (*i.e.*, if his obligation to pay money to Chance monthly is recharacterized as alimony or support so that it can be deducted from his income, the debt will be nondischargeable under 11 U.S.C. § 523(a)(5)), White testified that he received bad advice from his income tax preparer, H & R Block, and that he should not have deducted the $979.00 from his 1998 income tax return. This testimony is

not credible. From other testimony and documentary evidence, the Court finds that White wanted to be able to deduct his payments to Chance because he thought it was unfair for him to have to pay tax on the entire amount of the Retirement Benefits when he was under court order to pay over a portion of those benefits to Chance monthly. White understandably thought that he should only pay tax on that portion of the Retirement Benefits he got to keep, and that Chance ought to pay tax on the Retirement Benefits she was getting through his ordered monthly turnover. The parties agreed to this new arrangement in April 1998, effective as of January 1, 1998.

For these reasons, the Court finds that White's obligation to pay $244.73 per month to Chance became an obligation "for alimony to, maintenance for, or support of" Chance in April 1998, effective as of January 1, 1998. As in *Davidson*, 947 F.2d at 1294, White cannot "escape the bankruptcy effects of his election to treat the payments as alimony," *id.* at 1297, under the doctrine of quasi estoppel. Thus, the Court concludes that the Debt is nondischargeable in accordance with 11 U.S.C. § 523(a)(5).[9]

**B. Does the Benefit of Discharge Outweigh the Detriment?**

■ As relevant here, for the Debt to be dischargeable pursuant to § 523(a)(15) of the Bankruptcy Code, the Court must find that the Debt was incurred in connection with a divorce decree (but was not a debt for alimony, maintenance, or support) and that "discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the

---

**9.** While these findings and conclusions make further analysis unnecessary, the Court will address the issues presented under 11 U.S.C.

§ 523(a)(15) to facilitate appellate review of all of the parties' contentions.

debtor." [10] 11 U.S.C. § 523(a)(15)(B). Chance bears the burden of proof that the Debt was incurred in connection with a divorce decree. The burden of proof then shifts to White to establish that the benefit to him of a discharge of the Debt outweighs the detrimental consequences to Chance. *See In re Gamble,* 143 at 226; *In re Smith,* 256 B.R. at 593.

■■ As noted by the court in *In re Molino,* 225 B.R. 904 (6th Cir. BAP 1998):

> The best way to apply the 11 U.S.C. § 523(a)(15)(B) balancing test is to review the financial status of the debtor and the creditor and compare their relative standards of living to determine the true benefit of the debtor's possible discharge against any hardship the spouse, former spouse and/or children would suffer as a result of the debtor's discharge. If, after making this analysis, the debtor's standard of living will be greater than or approximately equal to the creditor's if the debt is not discharged, then the debt should be nondischargeable under the 523(a)(15)(B) test. However, if the debtor's standard of living will fall materially below the creditor's standard of living if the debt is not discharged, then the debt should be discharged under 11 U.S.C. § 523(a)(15)(B).

*Id.* at 908–09. In applying this balancing test, the courts consider the totality of the circumstances including (i) the amount of debt involved, including all payment terms, (ii) the current income of the debtor, objecting creditor and their respective spouses, (iii) the current expenses of the debtor, objecting creditor and their respective spouses, (iv) the current assets, including exempt assets of the debtor, objecting creditor and their respective spouses, (v) the current liabilities, including those discharged by the debtor's bankruptcy, of the debtor, objecting creditor and their respective spouses, (vi) the health, job skills, training, age and education of the debtor, objecting creditor and their respective spouses, (vii) any changes in the financial conditions of the debtor and the objecting creditor which may have occurred since the entry of the divorce decree, (vii) the amount of debt which has been or will be discharged in the debtor's bankruptcy, (ix) whether the objecting creditor is eligible for relief under the Bankruptcy Code, and (x) whether the parties have acted in good faith in the filing of the bankruptcy and the litigation of the § 523(a)(15) issues. *See In re Gamble,* 143 at 226; *Patterson v. Patterson (In re Patterson),* 132 F.3d 33, 1997 WL 745501, *3 (6th Cir.1997); *In re Molino,* 225 B.R. at 909; *Fitzsimonds v. Haines (In re Haines),* 210 B.R. 586, 594 (Bankr.S.D.Cal.1997); *Bodily v. Morris*

---

**10.** Under 11 U.S.C. § 523(a)(15)(A), the Debt would be dischargeable if White proved by a preponderance of the evidence that he lacked the ability to pay the Debt. *See Gamble v. Gamble (In re Gamble),* 143 F.3d 223, 226 (5th Cir.1998) ("In assessing the evidence, the bankruptcy court assigned Ms. Gamble the initial burden of showing that § 523(a)(15) was applicable to the debt in question, whereupon Mr. Gamble had the burden of proving that one of the exceptions applied to take it out. We find nothing amiss in this arrangement. It accords with traditional notions of the prima facie case and affirmative defense, is in line with the rulings of the majority of courts to have considered the issue, and is completely consistent with the statutory language.") (citations omitted); *Smith v. Smith (In re Smith),* 256 B.R. 590, 593 (Bankr. N.D.Tex.2001) ("As the debt in question arises from a divorce decree, Ms. Smith satisfied her initial burden of proof. Mr. Smith must then carry the burden of establishing that he meets either of the two exceptions set forth at subsections (A) and (B) of § 523(a)(15).") (citation omitted). Because White did not contend that he lacked the ability to pay the Debt, the Court will not address that basis for declaring the Debt dischargeable.

*(In re Morris)*, 193 B.R. 949, 954 (Bankr. S.D.Cal.1996); *In re Smither*, 194 B.R. 102, 111 (Bankr.W.D.Ky.1996); *Hill v. Hill (In re Hill)*, 184 B.R. 750, 756 (Bankr. N.D.Ill.1995).

■ Here, the Court has already found that the Debt was incurred in connection with the Final Decree and that it is in the nature of support or alimony. However, for purposes of addressing White's contentions under § 523(a)(15)(B) of the Bankruptcy Code, the Court will analyze the evidence as if the Debt represented only a division of the marital estate. Thus, under § 523(a)(15)(B), the Debt will not be dischargeable unless White carries his burden of proof and establishes that the benefit to him of discharging the Debt outweighs the detrimental consequences to Chance. The balancing test required by § 523(a)(15)(B) is applied to the Debt as set forth below.

### 1. Amount of debt involved

The Debt at issue here is $8,820.28 as of June 30, 2001 and increases by $244.73 each month.

### 2. Current income

As set forth above, for the last several years White has had an adjusted gross income, on average, of $50,000.00 annually. In 1999, his year of highest adjusted gross income, White's income was $53,716.00. Conversely, Chance and her new spouse have had combined annual incomes of a low of approximately $60,000.00 in 1996 [11] and a high of approximately $80,000 in 2000.

### 3. Current expenses

Chance testified that she and her new spouse are able to pay their monthly expenses which total approximately $4,900.00 per month. *See* Debtor's Exhibit A at pp. 12–13, Answer to Interrogatory No. 12. Based upon a review of the list of monthly expenses identified by Chance in her answers to interrogatories, *see id.*, it appears that Chance and her husband enjoy a comfortable, but not extravagant, lifestyle.

Similarly, based upon the information contained in Schedule J in White's recently filed chapter 13 case pending in this Court,[12] White's standard of living is comfortable, but not extravagant. *See* Debtor's Schedule J, as referenced in Exhibit P–24 at p. 5, Debtor's Answer to Interrogatory No. 16. White listed current disposable income of $811.00 per month which he proposes to pay to his creditors through his chapter 13 plan. *See id.*

### 4. Current assets

There is little evidence in the record with respect to the parties' current assets. Chance and her current husband apparently own their home, subject to a $136,632.56 mortgage debt. *See* Debtor's Exhibit A at p. 13, Answer to Interrogatory No. 13. White's schedules in his recently filed chapter 13 case reflect real property valued at $100,000.00, subject to a mortgage debt of $76,230.00, and personal property of $76,191.00. *See* Debtor's Schedules A and B.

### 5. Current liabilities

As noted previously, Chance's monthly expenses total approximately $4,900.00. *See* Exhibit B at pp. 12–13, Answer to Interrogatory No. 12. Moreover, Chance's long term debts total approximately $161,500.00. *See id.* at 13, Answer to In-

---

11. Although Chance did not remarry until October 1996. Chance testified that she and her new husband had combined earnings in 1997 of approximately $65,000.00.

12. *See* pp. 558–59, *infra*.

terrogatory No. 13. White's monthly expenses total approximately $2,229.00. *See* Debtor's Schedule J, as referenced in Exhibit P–24 at p. 5, Answer to Interrogatory No. 16. White's secured debts total approximately $96,853.00. *See* Debtor's Schedule D.

### 6. Health, job skills, training, age and education

This factor is discussed in detail previously. *See* pp. 8–9, *supra.* In sum, both White and Chance are well educated, healthy, approximately the same age, and enjoy good jobs. However, Chance now has greater opportunities for advancement in her employment than White does. No evidence was elicited regarding Chance's new spouse, other than Chance's testimony that he earned between $27,000.00 and $30,000.00 a year for the last several years.

### 7. Dependents

Chance and White had a daughter, Shannon, from their marriage. While Shannon is no longer a minor, she has a child that she cannot support without assistance. Chance stated in her interrogatory answers that she assists Shannon and provides partial support of her granddaughter. *See* Exhibit A at p. 11, Answer to Interrogatory No. 5. However, the amount of support provided was not detailed in those answers and no other evidence was elicited regarding other possible dependents of either Chance or White.

### 8. Changes in financial condition since the divorce

As previously noted, Chance remarried ten months after the divorce was granted in 1996. White has not remarried. While both Chance and White have enjoyed salary increases, Chance's salary has increased more significantly. At the time of the divorce, Chance made approximately $31,000.00 annually. Her 2000 income was approximately $50,000.00. As noted previously, Chance's new spouse makes between $27,000.00 and $30,000.00 annually.

White's income has increased, but modestly, and he testified that no further material increases are likely.

### 9. Amount of debt to be discharged

No evidence regarding this factor was elicited at trial. While the Court could take judicial notice of the file in the underlying chapter 7 case, White did not ask the Court to take such judicial notice, and Chance did not have the opportunity to rebut that potential evidence.

### 10. Eligibility for relief under Bankruptcy Code

While Chance is eligible for relief under the Code, it appears that no relief is necessary.

### 11. Good faith

The bankruptcy case underlying this adversary complaint was initially filed by White as a chapter 13 case. The Standing Chapter 13 Trustee (the "Chapter 13 Trustee") moved for conversion of the bankruptcy case to chapter 7 because the "Debtor is attempting, in bad faith, to discharge past and possibly future property settlement obligations." *See* Trustee's Motion to Convert Chapter 13 Case to Chapter 7. Instead of litigating the good faith issue, White consented to the conversion of his bankruptcy case to chapter 7. While Chance's complaint to determine dischargeability of debt was pending in White's (now) chapter 7 case, White filed a second bankruptcy case—once again seeking relief under chapter 13 of the Bankruptcy Code.

Obviously, one reason for White's new chapter 13 filing is to have the super dis-

charge of chapter 13 available to him if he successfully defends against Chance's contention that the Debt is nondischargeable under § 523(a)(5), but is unsuccessful in establishing that the Debt should be discharged under § 523(a)(15)(B). A debt that is nondischargeable under § 523(a)(5) is nondischargeable in a chapter 13 case, while a debt that is nondischargeable under § 523(a)(15)(B) is *dischargeable* in chapter 13. *See* 11 U.S.C. § 1328. In short, White is hedging his bets through his latest chapter 13 filing.

However, neither Chance nor the Chapter 13 Trustee have challenged White's good faith in the filing of his second bankruptcy case, and neither have sought the dismissal or conversion of that case. If motions to dismiss or convert White's second case are filed, the Court will consider those issues at that time. On this record, there is no basis for the Court to conclude that White filed his first bankruptcy case in bad faith or that White has litigated these nondischargeability issues in bad faith.

After applying the balancing test and considering all of the relevant factors, the Court concludes that White failed to prove by a preponderance of the evidence that the benefit he would obtain from discharging the Debt outweighs the detrimental consequence to Chance from discharging the Debt. While it is clear that White does not want to make those payments required by the Enforcement and Modification Order, it is not clear that White's standard of living would fall materially below Chance's standard of living if the Debt is not discharged. While Chance's household enjoys two incomes, it has expenses for at least two and probably three people (partial expenses for Chance's daughter, Shannon, and her granddaughter). While White only has his income, he only has expenses for himself to pay.[13] Thus, on this record, the Court finds that White's standard of living is approximately equal to Chance's standard of living and concludes that the Debt is not dischargeable under § 523(a)(15)(B) of the Bankruptcy Code.[14]

### C. Should Attorneys' Fees be Awarded as part of the Nondischargeable Debt?

Chance seeks to recover the attorneys' fees she has incurred in her efforts to collect the Debt before both the state court and this Court. Because the Final Decree does not provide for a recovery of attorneys' fees if one spouse is required to hire an attorney to enforce its terms, Chance seeks to recover her fees pursuant to § 9.014 of the Texas Family Code, which gives the state court discretion to award reasonable attorneys' fees as costs in a

---

**13.** White testified that Shannon moved in with him in late 1996 when she became pregnant. That testimony is consistent with the modification to the Final Decree ordered by the state court because Chance was ordered to pay White child support until May 1, 1997 (presumably when Shannon reached majority). *See* Exhibit P–18 at 2. However, White did not testify that he currently contributes to the support of either Shannon or his granddaughter.

**14.** The Court does not find the facts of this case to be particularly compelling in either parties' favor under § 523(a)(15)(B). While White can, but does not want to, pay his former spouse in accordance with the Enforcement and Modification Order, given Chance's financial circumstances, it is not clear that Chance would suffer a material hardship if the Debt were discharged. However, since the burden of proof is on White to establish that his standard of living will fall materially below Chance's if the Debt is not discharged, the Court is satisfied that White failed to carry his burden of proof here and the Debt should be declared nondischargeable.

divorce proceeding. *See* TEX. FAM.CODE § 9.014 (West 1997) ("The court may award reasonable attorney's fees as costs in a proceeding under this subchapter."). Chance made a similar request of the state court when she sought to have the Final Decree enforced by the state court. The state court did not award attorneys' fees and costs to Chance. Rather, the state court exercised its discretion and ordered that each party would bear her/his own attorneys' fees and costs. *See* Exhibit P–18 at 4.

 Under the "American Rule," in cases brought under federal law, attorneys' fees are not ordinarily recoverable absent specific statutory authority, a contractual right, or aggravated conduct. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Dennison v. Hammond (In re Hammond)*, 236 B.R. 751, 769 (Bankr.D.Utah 1998). There is no general right to recover attorneys' fees under the Bankruptcy Code, *see Renfrow v. Draper*, 232 F.3d 688, 693 (9th Cir.2000), and neither § 523(a)(5) nor § 523(a)(15) specifically provides that the prevailing party will be awarded attorneys' fees. *See* 11 U.S.C. §§ 523(a)(5), 523(a)(15).

Several courts have concluded that attorneys' fees are nondischargeable under § 523(a)(5) where the fees were awarded as part of the "support obligation" under the divorce decree. *See, e.g., In re Nunnally*, 506 F.2d at 1027 ("As for the attorney's fees awarded in the divorce proceedings, they are also protected from discharge. Courts have held attorney's fees nondischargeable when awarded under a state statute allowing such fees as 'alimony.' "); *see also Williams v. Williams (In re Williams)*, 703 F.2d 1055, 1057 (8th Cir.1983) (affirming that a debtor's agreement to pay his wife's attorney's fees was "in the nature of support," and

therefore nondischargeable). Other courts have concluded that attorneys' fees form a part of a bankruptcy claim and can be nondischargeable where the creditor has "a contractual right to them valid under state law." *Jordan v. Southeast Nat'l Bank (In re Jordan)*, 927 F.2d 221, 226–27 (5th Cir.1991), *overruled on other grounds by Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257 (5th Cir. 1993).

However, Chance was not awarded the attorneys' fees at issue here as part of the Final Decree. In fact, the state court declined to award Chance her attorneys' fees when that issue was presented to it. *See* Exhibit P–18 at 4. Moreover, the Final Decree does not contain any provision with respect to the payment of attorneys' fees if one spouse must bring litigation to enforce the terms of the Final Decree. In short, Chance has no contractual right to recover her attorneys' fees from White. Because Chance has no contractual right to recover her attorneys' fees from White and because the fees were not awarded by the state court as part of a "support obligation," the Court will not award attorneys' fees to Chance in connection with this action under § 523(a)(5).

For similar reasons, the Court will not award attorneys' fees to Chance in connection with this action under § 523(a)(15). In *In re Hammond*, 236 B.R. at 769, the court declined to award attorneys' fees incurred in prosecuting a § 523(a)(15) complaint, noting that "[t]he Decree does not contain a provision allowing reasonable expenses incurred in enforcing the Decree … We have found no case law, contractual or statutory basis for an award of Dennison's attorney fees incurred in prosecuting this proceeding, and therefore deny the same." *See also Colbert v. Colbert (In re Colbert)*, 185 B.R. 247, 250 (Bankr. M.D.Tenn.1995) (finding that the inquiry

under § 523(a)(15) is to "determine what portion of the award in state court is non-dischargeable, not to award additional support or create new, nondischargeable debt").

For these reasons, the Court concludes that each party must bear her/his own costs, including attorneys' fees, in connection with this action.

A Judgment consistent with this Memorandum Opinion will be entered separately.